UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PROGRESSIVE DEMOCRATS FOR
SOCIAL JUSTICE, et al.,

Plaintiffs,

v.

ROB BONTA,

Defendant.

Case No. 21-cv-03875-HSG

**ORDER DENYING PLAINTIFFS'
MOTION FOR SUMMARY
JUDGMENT AND GRANTING
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

Re: Dkt. Nos. 43, 45

Pending before the Court are the parties' cross-motions for summary judgment. The Court held a hearing on the cross-motions. For the reasons detailed below, the Court **GRANTS** Defendant's motion and **DENIES** Plaintiffs' motion.

I.   **BACKGROUND**

On May 28, 2021, Plaintiffs Progressive Democrats for Social Justice ("PDSJ"), Krista Henneman, and Carlie Ware filed an ex parte application for a temporary restraining order ("TRO") forbidding Defendant Rob Bonta, in his official capacity as Attorney General of the State of California, from enforcing California Government Code § 3205 against Plaintiffs, and directing Defendant to forbid the Santa Clara County District Attorney from enforcing § 3205 against them as well. Dkt. No. 14. The Court denied this application on July 16, 2021. *See* Dkt. No. 26.

The parties are familiar with the facts of this case, and they have agreed on a joint statement of undisputed facts for purposes of their cross-motions for summary judgment. *See* Dkt. No. 43-2 ("Joint Statement").

PDSJ is a Democratic club chartered by the Democratic Party of Santa Clara County. *See id.* at ¶ 2. Its stated purposes are to (1) inspire grassroots participation in the political process; (2) provide a forum for education and communication; (3) identify and support truly progressive

candidates for elective office; (4) research selected ballot initiatives and proposed legislation and strive to inform voters regarding such issues; (5) further progressive reform within the Democratic Party; and (6) collaborate with non-partisan organizations that support the progressive movement. *See id.* at ¶ 8.  Approximately half of PDSJ is composed of Santa Clara County employees, including Plaintiffs Henneman and Ware, who are deputy public defenders with the Santa Clara County Public Defenders' Office.[1]  *See id.* at ¶¶ 1, 3, 5–6.

On July 11, 2021, Sajid Khan, a Santa Clara County public defender, announced his candidacy for the office of the Santa Clara District Attorney.  *See id.* at ¶ 9.  Mr. Khan is running against the incumbent, Santa Clara District Attorney Jeff Rosen.  *See* Dkt. No. 25.  During the hearing on the ex parte application for a temporary restraining order, the parties confirmed that the primary election will take place in June 2022 and the general election will take place in November 2022.  Dkt. No. 27 at 45:16–18.

Plaintiffs want to solicit campaign donations for Mr. Khan from other county employees, including other Santa Clara public defenders.  *See* Joint Statement at ¶ 10.  They believe that this will be more effective than general solicitations.  *See* Dkt. No. 43-3 ("Henneman Decl.") at ¶ 8; Dkt. No. 43-4 ("Ware Decl.") at ¶ 11.  However, Plaintiffs state that they cannot solicit contributions from county employees without violating California Government Code § 3205.  *See* Henneman Decl. at ¶ 11; Ware Decl. at ¶ 14.

Section 3205(a) provides that:

> An officer or employee of a local agency shall not, directly or indirectly, solicit a political contribution from an officer or employee of that agency . . . with knowledge that the person from whom the contribution is solicited is an officer or employee of that agency.

*See* Cal. Gov't Code § 3205(a).  A "local agency" is defined as "a county, city, city and county, political subdivision, district other than a school district, or municipal corporation."  Cal. Gov't Code § 3202(a).  A violation of § 3205 "is punishable as a misdemeanor," and "[t]he district

---

[1] Plaintiff Henneman is also the President of PDSJ and Plaintiff Ware is the Secretary.  *See id.* at ¶¶ 2, 4.

United States District Court
Northern District of California

1    attorney shall have all authority to prosecute under this section." *Id.* § 3205(d).  However, the

2    statute does not prohibit a "solicitation made to a significant segment of the public which may

3    include officers or employees of that local agency." *Id.* § 3205(c).  In short, § 3205 prevents local

4    employees from specifically targeting their colleagues for campaign contributions.

5            The parties agree that as Santa Clara public defenders, Plaintiffs Henneman and Ware are

6    employees of a local agency within the meaning of the statute.  Plaintiffs state that all Santa Clara

7    County employees were cautioned against soliciting campaign contributions from their fellow

8    County employees in a memorandum from Santa Clara County counsel circulated in August 2020.

9    *See* Henneman Decl. at ¶¶ 14–15; Ware Decl. at ¶¶ 17–18.  Plaintiffs contend that they do not

10   have supervisory authority over any other Santa Clara County employees, and would not solicit

11   campaign contributions at work, or use any county resources.  *See* Henneman Decl. at ¶¶ 12–13;

12   Ware Decl. at ¶¶ 15–16.

13           Plaintiffs argue that § 3205 is unconstitutional under the First Amendment and the Equal

14   Protection Clause as applied to Plaintiffs because it treats local employees differently than state

15   employees, and is therefore not narrowly tailored.  *See generally* Dkt. No. 43-1.  They seek "an

16   appropriate injunction prohibiting criminal enforcement" of § 3205 so they may solicit campaign

17   contributions for the upcoming campaign without fear of prosecution.  *See id.* at 21.  Unlike at the

18   TRO stage, Plaintiffs note that their requested injunction would prohibit the enforcement of

19   § 3205 against *any* local employees, and not just Plaintiffs.  *See* Dkt. No. 43-1 at 8.  The parties

20   agree that this matter may be resolved on their cross-motions for summary judgment.  *See* Dkt.

21   Nos. 43-1, 45,

## II.    LEGAL STANDARD

23           Summary judgment is proper when a "movant shows that there is no genuine dispute as to

24   any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

25   A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*

26   *v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if there is evidence in the

27   record sufficient for a reasonable trier of fact to decide in favor of the nonmoving party.  *Id.*  The

28   Court views the inferences reasonably drawn from the materials in the record in the light most

United States District Court
Northern District of California

3

1   favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

2   574, 587–88 (1986), and "may not weigh the evidence or make credibility determinations,"

3   *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997), *overruled on other grounds by Shakur v.*

4   *Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008).

5        The moving party bears both the ultimate burden of persuasion and the initial burden of

6   producing those portions of the pleadings, discovery, and affidavits that show the absence of a

7   genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the

8   moving party will not bear the burden of proof on an issue at trial, it "must either produce

9   evidence negating an essential element of the nonmoving party's claim or defense or show that the

10  nonmoving party does not have enough evidence of an essential element to carry its ultimate

11  burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102

12  (9th Cir. 2000). Where the moving party will bear the burden of proof on an issue at trial, it must

13  also show that no reasonable trier of fact could not find in its favor. *Celotex Corp.*, 477 U.S. at

14  325. In either case, the movant "may not require the nonmoving party to produce evidence

15  supporting its claim or defense simply by saying that the nonmoving party has no such evidence."

16  *Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1105. "If a moving party fails to carry its initial

17  burden of production, the nonmoving party has no obligation to produce anything, even if the

18  nonmoving party would have the ultimate burden of persuasion at trial." *Id.* at 1102–03.

19       "If, however, a moving party carries its burden of production, the nonmoving party must

20  produce evidence to support its claim or defense." *Id.* at 1103. In doing so, the nonmoving party

21  "must do more than simply show that there is some metaphysical doubt as to the material facts."

22  *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. A nonmoving party must also "identify with

23  reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91

24  F.3d 1275, 1279 (9th Cir. 1996). If a nonmoving party fails to produce evidence that supports its

25  claim or defense, courts enter summary judgment in favor of the movant. *Celotex Corp.*, 477 U.S.

26  at 323.

27  **III.   DISCUSSION**

28       Plaintiffs contend that unlike at the TRO stage, Defendant has now acknowledged that

United States District Court
Northern District of California

4

§ 3205 provides more severe restrictions on political solicitations from local employees than the statutes, laws, and regulations that govern the political activities of state employees. *See* Dkt. No. 43-1 at 1; *see also* Joint Statement at ¶¶ 27–33. Defendant affirmed it "is not aware of a California statute, rule, or regulation that prohibits all forms of political solicitations from one state employee to another state employee" as § 3205 does.[2] *See* Joint Statement at ¶ 31. Plaintiffs assert that this admission is dispositive because "State employees may do what Plaintiff county employees may not." *See* Dkt. No. 43-1 at 1. Plaintiffs argue that this distinction is irrational, and not narrowly tailored to a legitimate government interest, and therefore violates both the First Amendment and the Equal Protection Clause. *See id.* at 2.

### A. First Amendment

#### i. Level of Scrutiny

As before, the parties disagree about what level of scrutiny applies to both the First Amendment and Equal Protection Clause claims.[3] *Compare* Dkt. No. 43-1 at 9–14, *with* Dkt. No. 45 at 7–8, 13–18. For clarity, the Court addresses the level of scrutiny separately for each cause of action.

Turning to the First Amendment claim, Plaintiffs again argue that because § 3205 burdens political speech, the Court should apply some form of "close scrutiny," in which the restrictions on speech "must be 'closely drawn to avoid unnecessary abridgment of associational freedoms.'" *See* Dkt. No. 43-1 at 9, 11 (quoting *McCutcheon v. FEC*, 572 U.S. 185, 191 (2014) (plurality opinion)). Defendant argues that the Court should continue to apply the balancing test from *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968), as it did in the TRO order. *See* Dkt. No. 45 at 7–8, 13–18.

In the TRO order, the Court explained that because § 3205 only applies to public

---

[2] The parties acknowledge that California Government Code § 19990 applies to state employees. *See* Dkt. No. 26 at 14; *see also* Joint Statement at ¶¶ 27–28. However, § 19990 is not coextensive with § 3205, and does not impose criminal sanctions for violating its provisions. The application of § 19990 to state employees, therefore, does not resolve the issue before the Court: whether the disparate treatment of state versus local employees under § 3205 is unconstitutional.
[3] The parties suggest in passing that the level of scrutiny may not be dispositive. *See* Dkt. No. 43-1 at 2, 14–15; Dkt. No. 45 at 15–16. But given the centrality of this issue in the parties' briefs, the Court finds that it warrants some discussion at the outset.

United States District Court
Northern District of California

employees, the *Pickering* balancing test should apply:

> The Supreme Court has explained that the government "has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968). Thus, "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). The resulting challenge "is to arrive at a balance between the interests of the [employee], as a citizen in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568.
>
> . . .
>
> Under the *Pickering* balancing test, a court must first determine whether the speech at issue was that of the employee as a citizen on a matter of public concern. *See id.* at 418. "If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Id.* But if the speech was made as a citizen on a matter of public concern, then a court must balance the First Amendment claims of an employee versus the justification the government has for treating the employee differently from any member of the public. *Id.*

*See* Dkt. No. 26 at 9–13. The Court continues to believe that *Pickering* should apply to Plaintiffs' First Amendment claim, and adopts its prior analysis in its entirety. *See id.*; *see also Lane v. Franks*, 573 U.S. 228, 236 (2014) ("*Pickering* provides the framework for analyzing whether the employee's interest or the government's interest should prevail in cases where the government seeks to curtail the speech of its employees."). [4] To the extent that Plaintiffs still disagree, Dkt. No. 43-1 at 11–14, their arguments are preserved for appeal.

Plaintiffs also contend, in the alternative, that even if *Pickering* applies, some heightened version of its balancing test is warranted. *See* Dkt. No. 43-1 at 10–11. Plaintiffs argue that because § 3205 is an *ex ante* restriction on local employees' speech, the government's burden to

---

[4] The Court recognizes that the California Legislature—which enacted § 3205—is not the direct employer of either the state or local employees in this case. The Supreme Court has not, however, found this distinction dispositive in determining whether the government is acting as an employer for purposes of *Pickering*. *See, e.g.*, *NTEU*, 513 U.S. at 457–71 (applying *Pickering* where Congress enacted statutory prohibitions on all federal employees). The critical question appears to be whether the government has placed restrictions on public employees.

United States District Court
Northern District of California

justify the restriction must be greater.  *See id.* at 10 (citing *United States v. National Treasury Employees Union*, 513 U.S. 454, 468 (1995) ("*NTEU*")).  But at least one Justice of the Supreme Court has cautioned against too heavy a reliance on the distinction between *ex ante* rules and *ex post* punishments for employee speech.  *See, e.g.*, *NTEU*, 513 U.S. at 481 (O'Connor, J., concurring) ("To draw the line based on a distinction between *ex ante* rules and *ex post* punishments, in my view, overgeneralizes and threatens undue interference with the government's mission as employer . . . .").  Rather, the Supreme Court has focused on the *scope* of laws which regulate employee speech, noting that "[a] speech-restrictive law with 'widespread impact . . . gives rise to far more serious concerns than could any single supervisory decision.'" *See Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2472 (2018) (quoting *NTEU*, 513 U.S. at 468).

In any event, the Court does not believe that Plaintiffs' interpretation of *NTEU* is in conflict with this Court's prior application of the *Pickering* balancing test.  *See generally* Dkt. No. 26.  In *NTEU*, the Supreme Court considered a law which prohibited federal employees from "accepting any compensation for making speeches or writing articles," even when the topic was not related to the employee's job duties.  *See NTEU*, 513 at 457–59.  The Supreme Court emphasized that this ban "chill[ed]" a "broad category of expression by a massive number of potential speakers."  *Id.* at 467.  The Court further explained that the ban burdened both the speakers and members of the public who stood to benefit from hearing or reading the employees' speech.  *See id.* at 468–70.  The Supreme Court concluded that "[t]he Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government."  *Id.* at 468 (quoting *Pickering*, 391 U.S. at 571).

The Supreme Court in *NTEU* thus clarified that courts must consider the interest of *all* employees whose speech is restricted—not just any named plaintiffs—as well as the interest of any members of the public who have an interest in hearing this speech.  *Id.*  The Court agrees with Plaintiffs that the Court must consider the "widespread impact" of § 3205, and not just the limits

United States District Court
Northern District of California

1  placed on the two individual Plaintiffs and PDSJ. But because § 3205 only restricts local

2  employees' ability to solicit campaign contributions from other local employees, the general

3  public's interest in such speech is not directly implicated. Nothing in § 3205 prohibits local

4  employees from soliciting campaign contributions from members of the public at large. Section

5  3205 explicitly permits "solicitation made to a significant segment of the public which may

6  include officers or employees of that local agency." Cal. Gov't Code § 3205(c). Accordingly, as

7  the Court found before, it must balance the First Amendment interests of present and future

8  employees with the interests of the government in restricting this speech. *See* Dkt. No. 26 at 12.

9  Plaintiffs correctly point out that under *NTEU*, the government must also "demonstrate that

10  the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these

11  harms in a direct and material way." *See NTEU*, 513 U.S. at 475 (quotation omitted); *see also*

12  Dkt. No. 43-1 at 14–15. In short, the Supreme Court has stated that the government's stated

13  justification for the regulation of speech must be more than merely speculative. *Id.* Again, the

14  Court agrees that mere speculation will not suffice to support the constitutionality of § 3205. At

15  bottom, however, the Court must still weigh the interests of local employees against the interest of

16  the government in restricting their ability to solicit campaign contributions from other local

17  employees.

18        **ii.**    **Analysis**

19  Because the parties agree that the speech at issue here concerns employees speaking out as

20  citizens on a matter of public concern—an upcoming election—the Court continues to the second

21  step of the *Pickering* analysis: balancing local employees' First Amendment rights against the

22  government's justification for treating them differently from members of the public. *See Garcetti*,

23  547 U.S. at 418–20. In doing so, the Court does not minimize the importance of the First

24  Amendment rights at issue in this case. As the Supreme Court explained, "[t]here is no right more

25  basic in our democracy than the right to participate in electing our political leaders." *McCutcheon*,

26  572 U.S. at 191. The ability to speak freely on matters of public concern also plays a pivotal role

27  in preserving this right: "[I]t is the essence of self-government." *See Connick v. Myers*, 461 U.S.

28  138, 145 (1983) (quotation omitted). "Accordingly, the [Supreme] Court has frequently

8

1    reaffirmed that speech on public issues occupies the highest rung of the h[ie]rarchy of First

2    Amendment values, and is entitled to special protection." *Id.* (quotations omitted).

3        In addition to the general importance of free speech and political discourse in our

4    democracy, Plaintiffs highlight the "real-world impacts" of § 3205 on their rights:

6            Plaintiffs and hundreds of thousands of county and local employees
             may not solicit donations from many of their friends who also work
7            for the same agency, even outside of work and without using any of
             the trappings of their positions.

9    Dkt. No. 43-1 at 9.  Plaintiffs also explain how § 3205 is affecting them specifically.  They state

10   that the Khan campaign has compiled a list of people to contact directly to ask for campaign

11   contributions, and Plaintiffs would like to specifically ask other Santa Clara public defenders on

12   the list to contribute to the campaign  *See, e.g.*, Henneman Decl. at ¶¶ 7, 10.  Plaintiffs believe that

13   directly soliciting these colleagues for campaign contributions will be more effective than general

14   solicitations to the public.  *Id.* at ¶ 8.  They thus contend that § 3205 is limiting their ability to

15   campaign effectively.

16       Neither Defendant nor this Court questions the sincerity of Plaintiffs' contentions.  But

17   government employees' political speech rights are not absolute.  For over a century, the Supreme

18   Court has repeatedly upheld restrictions on government employees' rights to engage in partisan

19   political activity.  The fact that § 3205 prevents local employees from soliciting campaign

20   contributions from their colleagues is therefore neither unusual nor dispositive.

21       A brief overview of the Supreme Court's jurisprudence in this area is instructive in

22   evaluating whether the California Legislature has struck an appropriate balance between the

23   political speech rights of local employees' and the government's interests in restricting inter-

24   agency solicitations.

26   • In *Ex parte Curtis*, 106 U.S. 371 (1882), the Supreme Court upheld the

27       constitutionality of an 1876 act prohibiting federal officials from requesting or

28       receiving money from other federal employees for political purposes.  Much like

United States District Court
Northern District of California

9

§ 3205, the act at issue in *Curtis* made such conduct punishable as a misdemeanor.  *See id.* at 382.  In upholding the act, the Court reasoned that if such solicitations were permitted, employees' political rights could be unduly influenced by their superiors: "[I]t is easy to see that what begins as a request may end as a demand," and "[c]ontributions secured under such circumstances will quite as likely be made to avoid the consequences of the personal displeasure of a superior."  *Id.* at 373.  The Supreme Court therefore recognized the federal government's power to impose reasonable regulations on the political activities of its employees.  *Id.* at 373–75.

- In *United Public Workers v. Mitchell*, 330 U.S. 75 (1947), the Supreme Court upheld the Hatch Act of 1939, 5 U.S.C. §§ 7321 *et seq.*, a federal statute which forbade federal employees from engaging in certain political activities, including taking "any active part in political management or in political campaigns."  *Id.* at 78 (quotations omitted).  In doing so, the Court explained that "[t]he conviction that an actively partisan governmental personnel threatens good administration has [only] deepened since *Ex parte Curtis*."  *Id.* at 98–99.  The Court further concluded that "[t]he determination of the extent to which political activities of governmental employees shall be regulated lies primarily with Congress."  *Id.* at 102.

- The Supreme Court reaffirmed the constitutionality of the Hatch Act in *U. S. Civil Service Commission v. National Association of Letter Carriers, AFL-CIO*, 413 U.S. 548, 554 (1973) ("*Letter Carriers*").  The Supreme Court identified several government interests weighing in favor of laws like the Hatch Act that restrict government employee's political rights.  *First*, the Court emphasized the importance of impartiality in the administration of laws.  *See id.* at 564–65 ("[E]mployees should administer the law in accordance with the will of Congress, rather than in accordance with their own or the will of a political party.").  *Second*, and relatedly, the Court explained that it is equally important that federal employees also appear impartial to

members of the public, to promote public confidence in the system.  *Id.  Third*, the
Court explained that government employees "should not be employed to build a
powerful, invincible, and perhaps corrupt political machine."  *Id.  Lastly*, the Court
reiterated that such laws also protect government employees' own rights to be free
"from express or tacit invitation to vote in a certain way or perform political chores in
order to curry favor with their superiors rather than to act out their own beliefs."  *Id.* at
566–67.

- In *Broadrick v. Oklahoma*, 413 U.S. 601, 602 (1973), which was published the same
  day as *Letter Carriers*, the Supreme Court upheld Oklahoma's state-law version of the
  Hatch Act.  The statute included similar language to § 3205, prohibiting the solicitation
  of political contributions from colleagues.  *See id.* at 603–06, 610–11.  The plaintiffs
  and the Supreme Court noted that states have similar interests to those of the federal
  government in preventing corruption and "political extortion" among employees.  *Id.* at
  606–07.  The Court further noted that the Oklahoma statute sought "to regulate
  political activity in an even-handed and neutral manner."  *Id.* at 616.  The plaintiffs in
  *Broadrick* argued that the Oklahoma statute was nevertheless unconstitutionally vague
  and overbroad, but the Supreme Court rejected this challenge.  *See id.* at 606–18.

- Ten years later, in *Connick v. Myers*, the Supreme Court again recognized that
  government employers have legitimate "interest[s] in the effective and efficient
  fulfillment of [their] responsibilities to the public," including "promot[ing] efficiency
  and integrity in the discharge of official duties, and [] maintain[ing] proper discipline
  in public service."  *See* 461 U.S. at 150–151 (quotation omitted).  The Supreme Court
  also reiterated that "official pressure upon employees to work for political candidates
  not of the worker's own choice constitutes a coercion of belief in violation of
  fundamental constitutional rights."  *Id.* at 149.

As these cases illustrate, the Supreme Court has repeatedly acknowledged the importance of the government's interests in placing reasonable restrictions on public employees' political speech.  The Court has recognized that as employers, both federal and state governments have a strong interest in regulating public employees *qua* employees to "promot[e] the efficiency of the public services [they] perform[] through [their] employees." *Pickering*, 391 U.S. 568.  Governments may therefore regulate employees to "maintain[] . . . discipline by immediate superiors or harmony among coworkers." *Id.* at 570.  But critically, public employees are also in positions of public trust.  Concerns about corruption and coercion in the workplace are thus heightened.  *See, e.g.*, *Letter Carriers*, 413 U.S. at 565 (noting that government employees "are expected to enforce the law and execute the programs of the Government without bias or favoritism for or against any political party or group or the members thereof").  The government has unique interests in maintaining public confidence in the government and in public employees. *See id.* (finding that restrictions on government employees' speech are necessary "if confidence in the system of representative Government is not to be eroded to a disastrous extent").

Additionally, the Supreme Court has recognized that federal and state governments have an important interest in protecting the First Amendment rights of public employees.  Plaintiffs in this case have emphasized their individual desire to solicit campaign contributions from their colleagues.  *See, e.g.*, Joint Statement at ¶ 10.  But Plaintiffs appear to disregard whether their colleagues would feel uncomfortable with or pressured by such solicitations.  Government employees should "be free from pressure and from express or tacit invitation to vote in a certain way or perform political chores in order to curry favor with their superiors rather than to act out their own beliefs." *Letter Carriers*, 413 U.S. at 566–67.  Plaintiffs' First Amendment rights are therefore not the only First Amendment rights at issue in this case.  "When an employee speaks as a citizen addressing a matter of public concern, the First Amendment requires a delicate balancing of the competing interests surrounding the speech and its consequences." *Garcetti*, 547 U.S. at 423.  Here, the government has a strong interest in protecting other public employees from political pressure, and that interest must be considered as well.

The Supreme Court's longstanding recognition of these government interests, coupled with

1    its approval of similar restrictions on employees' speech, strongly supports Defendant's argument

2    that § 3205 is not unconstitutional.

3        Against the weight of these interests, the Court finds it significant that § 3205 does not

4    prohibit all political participation.  Section 3205 includes an exception that allows county, city and

5    local agency employees to solicit political donations from their colleagues "if the solicitation is

6    part of a solicitation made to a significant segment of the public which may include officers or

7    employees of that local agency."  Cal. Govt. Code § 3205(c).  Even if Plaintiffs believe Santa

8    Clara County employees would be particularly interested in the campaigns for Santa Clara County

9    District Attorney, they may circulate solicitations that encompass County employees.

10       Plaintiffs attempt to minimize the importance of Defendant's interests in this case by

11   pointing to § 3205's limited legislative history.  *See* Dkt. No. 47 at 2–5.  But California has

12   recognized—and sought to prevent—the existence and appearance of corruption and coercion

13   among public employees for over a century.  The parties appear to agree that § 3205 was first

14   enacted in some form as early as 1913.  *Compare* Dkt. No. 45 at 2, *with* Dkt. No. 47 at 2, & n.2.

15   Early on, these restrictions applied to state employees, and prevented, among other things,

16   solicitations of state employees by their colleagues.  *See* Dkt. No. Dkt. No. 45-1 ("Dalju Decl."),

17   Ex. 4 at 91–92.[5]  In 1963, the California Legislature amended the statute to address concerns that

18   "[l]imits on political activity by employees of *local* governmental units vary widely from county

19   to county and from city to city throughout California."  *See id.* at 97 (emphasis added); *see also*

20   *id.*, Ex. 3 at 83–85.  For example, under the Los Angeles *County* charter, county employees had

21   "almost no political freedom" and voters defeated an attempt to amend the charter to address this

22   issue directly.  *See id.*, Ex. 4 at 97.  The *City* of Los Angeles, by contrast, had "no limit on

23   employee political freedom in its charter."  *See id.*

24       According to the legislative history, amendments were proposed in 1976 to repeal the

25   solicitation restrictions on both state and local employees.  *See id.*, Ex. 1 at 14–17.  Under the

26   initial amendment, local agencies would adopt their own rules and regulations in city and county

27

28   _____

[5] For ease of reference, the Court refers to the PDF pagination unless otherwise specified.

13

charters to govern the political activities of their employees during working hours or on work premises. *See, e.g.*, *id.* at 65. The legislative history does not explain what prompted this proposal. Regardless of the impetus for this change, the Legislature received some opposition to the proposed repeal as to local employees from local governments, including the Cities of Sacramento and Los Angeles. *See id.* at 31–35, 51–54, 60–65, 71. In contrast, in the end the State Personnel Board did not oppose repealing the solicitation restrictions on state employees. *See id.* at 56, 70–71, 77. The Board recognized the need to "maintain a State work force free from political influence and patronage." *See id.* at 70. However, it noted that regardless of California's solicitation restrictions, state employees in federally funded positions would still be subject to the Federal Hatch Act, which prohibits encouraging another employee to make a political contribution." *See id.* The bill was ultimately amended to repeal the solicitation restrictions only as to state employees, leaving the restrictions in place as to local employees. *Id.*

As Plaintiffs point out, the Governor's Director of Employee Relations, Marty Morgenstern, recommended that the Governor veto this version of the bill. *See id.* at 72. Mr. Morgenstern cited the disparate treatment of state and local employees. *See id.* Far from thinking that corruption and coercion were no longer problems in California, he appeared to believe that the solicitation ban should continue as to state employees as well. *See id.* He explained that "it's probably bad business to allow one State employee to solicit from another on the job," and "it might well be that State employees would resent such activities." *See id.* However, the Governor nevertheless signed the bill into law. *See* 1976 Cal. Session Laws Ch. 1422. The statute was last amended in 1995, at which point the Legislature continued to explain that "neither [government] employees nor officers should be coerced into contributions for fear that their employment may be in jeopardy if they do not contribute." Cal. Bill Analysis, S.B. 1308, 1995–1996 Session (July 12, 1995).

Plaintiffs attempt to dismiss this legislative history by suggesting that "interest groups weighed in" to create an anomalous distinction in the law between state and local employees. *See* Dkt. No. 47 at 3–4. But the legislative history, when read in its entirety, indicates that a lack of uniformity was a distinct problem among local agencies across the state. There was evidence that

14

1   local employees' ability to engage in political activity differed widely across the state depending

2   on which agency they worked for.  Additionally, there was evidence that in the past, these local

3   agencies had difficulty addressing these disparities on their own.  Los Angeles County's efforts to

4   amend its charter, for example, failed.  The initial 1976 amendment, which proposed eliminating

5   § 3205 as to both state and local employees, would have resulted in a return to this *ad hoc* system

6   in which local agencies could decide individually how (or even whether) to limit their employees'

7   political activity at work.  There is no evidence in the record that the local agencies would have

8   been better able to pass uniform and sufficiently protective rules and regulations in 1976 than they

9   were in 1963.  It is therefore not surprising that some local agencies opposed this change, and

10  § 3205 ultimately remained in place as to local employees.

11       The legislative history also suggests that the Legislature considered the applicability of

12  § 3205 to state employees too.  As noted above, the State Personnel Board concluded that some

13  state employees who were in federally funded positions would still be subject to restrictions under

14  the *federal* Hatch Act.  A letter from Assemblyman John Vasconcellos noted that at least he

15  believed there were still sufficient "precautions and protections" to prevent retaliation and the

16  politicization of the state civil service.  *See* Dalju Decl., Ex. 1 at 77.  While Plaintiffs contend that

17  "political favoritism" was at play, *see* Dkt. No. 47 at 3, this history can be equally read to suggest

18  that the Legislature was responding to the evidence before it.

19       Plaintiffs rely heavily on the fact that in 1976, Mr. Morgenstern stated that he could not see

20  a reason in the record to distinguish between state and local employees.  *See, e.g.*, *id.* at 4–5.  But

21  Plaintiffs offer no reason to credit this single, unelected advisor's opinion over the official

22  decision-making of the California Legislature and the Governor himself.  Even if some weight

23  could be given to his opinion, as noted above, Mr. Morgenstern explained that California had good

24  reason to limit the political activities of all state and local employees.  Moreover, the Supreme

25  Court has recognized that courts have at least some "obligation to defer to considered

26  congressional judgments about matters such as appearances of impropriety . . . ."  *NTEU*, 513 U.S.

27  at 476.  The Court therefore must give some deference to the reasoned decision-making of the

28  California Legislature in adopting and upholding § 3205 over the past several decades.

15

United States District Court
Northern District of California

1    Despite this history, Plaintiffs suggest that the Defendant offers only speculation that local

2    employees' solicitations would threaten the government's interests.  Plaintiffs seem to suggest that

3    under *NTEU*, the government must put forward some kind of data illustrating the benefits that

4    § 3205 has had on local government over the years.  *See* Dkt. No. 43-1 at 14–15.  But of course, if

5    § 3205 were successful, there would be few if any instances of employees coercing their

6    coworkers—explicitly or obliquely—to contribute to the campaigns of the solicitor's choosing.

7    Coercion, by its nature, is also insidious.  There will not always be a "smoking gun" that would

8    make it obvious to a third party that such coercion took place in the workplace.  *Cf. Williams-*

9    *Yulee v. Fla. Bar*, 575 U.S. 433, 447 (2015) (noting that "the concept of public trust" in the

10   integrity of public employees  "does not easily reduce to precise definition, nor does it lend itself

11   to proof by documentary record").  The Supreme Court in *NTEU* did not demand that the

12   government provide such evidence.  Instead, in determining whether the benefits from a statute

13   were purely speculative, the Supreme Court considered the nexus between the law and the

14   government employment.  *See NTEU*, 513 U.S. at 468–74.

15   In *NTEU*, the Court reasoned that the honorarium ban did not have a sufficient nexus to the

16   affected employees' work for the government, because the ban applied regardless of whether the

17   speech had anything to do with their job, and applied to speech outside the workplace.  *Id.*  The

18   Court seemed skeptical that there was a risk that low-level employees who lacked policymaking

19   authority could be swayed by the payment of honoraria in a way that would affect the integrity or

20   propriety of the government.  *Id.* at 469–70.  "Absent such a nexus," the Court reasoned, "no

21   corrupt bargain or even appearance of impropriety appears likely."  *Id.* at 474.  But the Court

22   explained that the consequences to these low-level public servants—and the public generally—

23   from the ban was significant.  *Id.*

24   In *NTEU*, the Supreme Court also contrasted the honorarium ban with the Hatch Act,

25   which was "aimed to *protect* employees' rights, notably their right to free expression, rather than

26   to restrict those rights."  *Id.* at 471 (emphasis in original).  The Court recognized that even a

27   lower-level employee "might impair efficiency and morale by using political criteria to judge the

28   performance of his or her staff."  *Id.* at 473.  The Court further indicated that the "employee-

16

protective rationale" provided by the Hatch Act is a "much stronger justification for a proscriptive rule than [is] the Government's interest in workplace efficiency." *Id.* at 475, n.21 (citing *Mitchell*, 330 U.S. 100–101).

So too here. Prohibiting local employees from soliciting campaign contributions from their fellow employees protects everyone's right to make political decisions based on their own beliefs rather than the perceived expediency of currying favor, or out of a fear of repercussions. Given this backdrop, the government's concern about coercion and corruption among local employees is neither speculative nor unreasonable. Considering the legislative history of § 3205 and the Supreme Court's jurisprudence, the Court finds that the California Legislature has reasonably weighed the interests of local employees like Plaintiffs against the government's interest in preventing both the proliferation and appearance of corruption and coercion in the workforce.

At bottom, Plaintiffs appear to suggest that California cannot have a legitimate interest in preventing coercion or corruption among any public employees because state employees are no longer subject to § 3205. But Plaintiffs' concern that state and local employees are now treated differently under § 3205 is simply not enough on its own to undermine the constitutionality of the statute under the First Amendment. The Supreme Court has made clear that "[a]lthough a law's underinclusivity raises a red flag, the First Amendment imposes no freestanding 'underinclusiveness limitation.'" *Williams-Yulee*, 575 U.S. at 448–49. As already discussed at length, the government's interests in preventing coercion and corruption are substantial. Indeed, in its briefing on the TRO, Plaintiffs seemed to acknowledge this implicitly, suggesting that it would likely be constitutional for the California Legislature to prohibit all state and local employees from soliciting campaign contributions. *See* Dkt. No. 14 at 7 ("[T]he state likely could ban political solicitation by *all* employees to promote its interests in avoiding corruption, coercion, and the appearance of corruption and coercion."). But "[a] State need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns." *Id.* at 449. The legislative history for § 3205 indicates that there was a specific concern about the uniformity of restrictions on local employees' speech in particular. This concern may have been compounded

1    by the relative size of this workforce—over one million employees of counties, cities, and special

2    districts in California.  *See* Joint Statement at ¶ 18.  The Court thus cannot conclude that it was

3    unreasonable or unlawful for § 3205 to focus on local employees.

4         The Court is not tasked with determining whether the California Legislature could have

5    devised a different or better system to eradicate political corruption and coercion among public

6    employees.  But in evaluating the balance the Legislature struck between these interests and the

7    political speech rights of public employees, the Court finds it significant that the Legislature

8    identified possible distinctions between state and local employees.  Defendant has accordingly

9    provided adequate justification for burdening the political solicitation rights of local employees to

10   protect employees and the public from coercion and corruption.  The Court finds that § 3205 does

11   not violate the First Amendment.

### B.    Equal Protection

#### i.    Level of Scrutiny

14        Defendant explains at the outset that the fact that state and local employees are treated

15   differently under § 3205 is not inherently problematic.  "[T]he Equal Protection Clause does not

16   forbid classifications" because "[o]f course, most laws differentiate in some fashion between

17   classes of persons."  *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).  "Legislatures are presumed to

18   have acted within their constitutional power despite the fact that, in practice, their laws result in

19   some inequality."  *Id.*  The Equal Protection Clause "simply keeps governmental decisionmakers

20   from treating differently persons who are *in all relevant respects* alike."  *Id.* (emphasis added).

21        In determining whether § 3205 treats similarly situated employees the same, Defendant

22   contends that some form of rational basis review should apply.  *See* Dkt. No. 45 at 18–19.  The

23   Supreme Court has explained in the context of the Equal Protection Clause:

25   > Although no precise formula has been developed, the Court has held
     > that the Fourteenth Amendment permits the States a wide scope of
26   > discretion in enacting laws which affect some groups of citizens
     > differently than others.  The constitutional safeguard is offended only
     > if the classification rests on grounds wholly irrelevant to the
27   > achievement of the State's objective.  State legislatures are presumed
     > to have acted within their constitutional power despite the fact that, in
28   > practice, their laws result in some inequality.  A statutory

United States District Court
Northern District of California

18

discrimination will not be set aside if any state of facts reasonably
may be conceived to justify it.

*McGowan v. Maryland*, 366 U.S. 420, 425–26 (1961).  Therefore, in general "the Equal Protection Clause requires only that the classification rationally further a legitimate state interest."  *Nordlinger*, 505 U.S. at 10.

Plaintiffs suggest that some level of heightened review is appropriate, however, because § 3205 "jeopardizes [the] exercise of a fundamental right."  *See id.*; *see* Dkt. No. 43-1 at 11, 13–14.  Plaintiffs first cite the Ninth Circuit's opinion in *Harwin v. Goleta Water District*.[6]  *Id.*  In *Harwin*, the Ninth Circuit considered the constitutionality of a California water district's ordinance, which disqualified water board members from reviewing water service applications if they had received a campaign contribution of at least $250 from the specific applicant.  *See* 953 F.2d 488, 489–90 (9th Cir. 1991).  The ordinance did not, however, disqualify board members from considering an application if the board member had received a campaign contribution of at least $250 from a person *opposing* the particular application for water service.  *See id.* Significantly, the Ninth Circuit considered this disqualification provision a campaign contribution limit.  *See id.* at 489, n.1.

In defining the appropriate level of scrutiny, the *Harwin* court reasoned that "discrimination in the First Amendment context is permissible only when the government can show that the discrimination is itself necessary to serve a substantial governmental interest."  *Id.* at 490.  But the court did not explicitly determine the level of scrutiny that is required in the Equal Protection context.  Rather, in a footnote, the court stated that "[w]hether analyzed under the First Amendment or under the Equal Protection Clause of the Fourteenth Amendment . . . discriminatory burdens on First Amendment rights have typically been subjected to strict scrutiny."  *Id.* at 491, n.6.  In the same footnote, the court also recognized that "it is conceivably arguable that a lower level of scrutiny should apply to discriminatory contribution limits because

---

[6] In explaining why *Pickering* should not apply in the Equal Protection context, Plaintiffs note that workplace policies that discriminate on the basis of race would still require the application of strict scrutiny.  *See* Dkt. No. 43-1 at 14.  Even as an illustration, however, this hypothetical is inapposite.  State and local employees are simply not inherently protected classes.

contribution limits are subject to a lower level of scrutiny than expenditure limits . . . ."  *Id.*  The Ninth Circuit thus recognized that there may be distinctions to be drawn in the level of scrutiny that applies to restrictions on political speech.  The case does not clarify what level of scrutiny should apply to restrictions on *solicitations* for campaign contributions in the Equal Protection Clause context.  The parties do not cite—and the Court has not found—a case addressing the level of scrutiny that should apply under the Equal Protection Clause to restrictions on soliciting public agency colleagues for campaign contributions.

Importantly, the differences between limitations on campaign contributions and limitations on solicitations for campaign contributions are not merely academic.  As with other political speech, the Supreme Court has recognized the importance of campaign contributions as "a general expression of support for the candidate and his views."  *See Buckley v. Valeo*, 424 U.S. 1, 21 (1976).  The Court has further noted the pragmatic reality that in modern elections, "the raising of large sums of money [is] an ever more essential ingredient of an effective candidacy."  *Id.* at 26.  In analyzing restrictions on contributions, the Court nevertheless has recognized the government's interests in preventing corruption and the appearance of corruption in politics.  *See id.* at 26–27 ("To the extent that large contributions are given to secure a political quid pro quo from current and potential office holders, the integrity of our system of representative democracy is undermined.").  In contribution cases, therefore, courts weigh the individual contributor's rights almost entirely against more generalized good governance and anti-corruption concerns.

Those general concerns, as already discussed, certainly exist in the context of solicitations for campaign contributions.  But critically, when evaluating limitations placed on solicitations by public employees for campaign contributions, courts must also consider the interests of the other public employees who would be the targets of political solicitations.  Those public employees are entitled to exercise their First Amendment rights free from the undue influence of their coworkers and supervisors.  There simply is no analogue in the contribution context for the rights of these potential solicitees:  while in contribution cases the would-be recipient of a banned contribution presumably will always have a strong and unambiguous personal interest in receiving more money, in the solicitation context, fellow employees may well feel burdened, intimidated, or even

20

threatened by solicitations from their boss, or from coworkers who could end up being their boss (or their boss's lieutenant) tomorrow.  The Supreme Court has identified this principle as the rationale for "employee-protective" laws like the Hatch Act.  *See NTEU*, 513 U.S. at 475, n.21; *Letter Carriers*, 413 U.S. at 566–67.  So the Court must take this distinction into account in considering whether the standard of review from the contribution line of cases is a good fit for this very different context.

Perhaps recognizing the lack of clarity in the law, Plaintiffs suggest instead that more broadly, under any applicable standard, "[t]he law must be closely tailored to a specific government interest."  *See* Dkt. No. 47 at 9, 14.  Plaintiffs rely on the Supreme Court's opinion in *McCutcheon v. Federal Election Committee*, which states that restrictions on political speech must be at least "closely drawn to avoid unnecessary abridgement of associational freedoms," and must address a state interest that is at least "important."  572 U.S. at 197.  But like *Harwin*, the Court in *McCutcheon* addressed campaign contribution limits in the context of the First Amendment and did not address how, if at all, the standard might differ under the Equal Protection Clause.  *See id.* at 191 ("The right to participate in democracy through political contributions is protected by the First Amendment . . . .").

In any event, even applying Plaintiffs' heightened standard, the Court finds that § 3205 addresses an important government interest and is at least "closely drawn to avoid unnecessary abridgement of associational freedoms."  *McCutcheon*, 572 U.S. at 197.

### ii.    Analysis

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike."  *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1063 (9th Cir. 2014) (quoting *City of Cleburne v. Cleburne Living Or.*, 473 U.S. 432, 439 (1985)).  Here, it is uncontested that only local employees are subject to § 3205, while state employees are not.  *See* Cal. Gov't Code § 3205(a); *see also* Joint Statement at ¶¶ 27–33.

As a threshold question, however, the parties dispute whether state and local employees are

United States District Court
Northern District of California

United States District Court
Northern District of California

similarly situated such that the Equal Protection clause is even implicated.  *Compare* Dkt. No. 47 at 11–13, *with* Dkt. No. 45 at 19–22.  The Court finds based on the record before it that state and local employees are not similarly situated.

*First*, the level of oversight for state and local employees is significantly different.  Unlike for local agencies, there is a single entity that oversees state employees.  The California Department of Human Resources ("CalHR") is responsible for issues related to state employee salaries and benefits, job classifications, civil rights, training, exams, recruitment and retention.[7] According to CalHR, "many of these matters are determined through the collective bargaining process managed by CalHR."[8]  CalHR also oversees the State Personnel Board functions of reviewing adverse actions taken against state employees and appeals from those actions.[9]  As part of this process, CalHR also provides guidance for Labor Relations Officers about what activities state employees may engage in.[10]  In their "Q&A" webpage, CalHR answers questions about what kind of political campaigning and fundraising is allowed in the workplace during work hours.[11] There is therefore a uniform process for creating, interpreting, and enforcing rules and regulations that apply to state employees.

Plaintiffs suggest that the oversight for state employees is actually decentralized because different state agencies may craft their own rules for their own employees.  *See* Dkt. No. 47 at 14–15.  Plaintiffs rely on California Government Code § 19990, which states that "[e]ach appointing power shall determine, subject to approval of the department, those activities which, for employees under its jurisdiction, are inconsistent, incompatible or in conflict with their duties as state officers or employees."  Cal. Gov't Code § 19990.  But as this provision makes clear, state agencies must still submit these rules to CalHR for approval.  *See id.* (noting that state agencies'

---

[7] *See* Cal. Dep't Of Hum. Res., About CalHR, https://www.calhr.ca.gov/pages/about-calhr.aspx (last visited Mar. 1, 2022).
[8] *Id.*
[9] *See* Cal. Dep't Of Hum. Res., Personnel Functions, https://www.calhr.ca.gov/state-hr-professionals/Pages/personnel-functions.aspx (last visited Mar. 1, 2022).
[10] *See* Cal. Dep't Of Hum. Res., Political Activities, Sept. 26, 2012, https://www.calhr.ca.gov/state-hr-professionals/Pages/political-activities.aspx (last visited Mar. 1, 2022).
[11] *See id.*

rules are "subject to approval of the department"). There is, therefore, a single entity that can provide guidance as to what is and is not permissible conduct for state employees, and ensure that those employees may work free of corruption or coercion.

In contrast, Plaintiffs do not cite—and the Court is not aware of—any similar oversight across the State's approximately 3,000 local agencies. *See* Joint Statement at ¶¶ 15–17. The possible differences across these agencies are not merely hypothetical. As detailed in Section III.A.ii above, the California Legislature recognized that in the past there had been great variability in the kinds of political activity that local employees were allowed to engage in. The lack of uniformity or a centralized decisionmaker could leave doubt about what kind of political activities are permitted by local employees. Moreover, without § 3205, these local agencies would be left to police themselves. This could leave local employees with little recourse if they felt undue pressure or coercion to contribute money to a campaign or political cause, even if it conflicted with their own personal beliefs.

*Second*, the Court finds that the size and nature of the state and local workforces are relevant distinctions. At least as of May 2021, there were only 369,611 state employees in California. *See* Joint Statement at ¶ 19. CalHR therefore has a sizeable, though apparently manageable, number of employees it helps oversee. However, there are over one million employees of counties, cities, and special districts in California. *See id.* at ¶ 18. Los Angeles County alone employs approximately 100,000 people. *See id.* at ¶ 21. And the City of Los Angeles has approximately 50,000 employees. Thus, just the City and County of Los Angeles alone employ approximately 40% of the *total* number of state employees.

Plaintiffs respond that this difference in size is nevertheless irrelevant. Plaintiffs note that there are agencies at the state and local level of differing sizes. *See* Dkt. No. 47 at 14. Plaintiffs posit the following hypothetical:

> A law clerk in a state judge's chambers may solicit political contributions for a judicial candidate from one of her two or three fellow clerks at a Friday happy hour and sit next to the other clerk the following week; meanwhile, a Los Angeles County janitor may not solicit contributions for a Presidential candi[d]ate from a Los Angeles County prosecutor at a barbecue that they both happen to attend with

United States District Court
Northern District of California

1
2
3

> family, even though both are among approximately 100,000 county
> employees, and even though they may go to work more than 85 miles
> (and an hours-long drive in LA traffic) from each other.

4
5
6
7
8
9

*See id.*  Plaintiffs' argument, however, misses the point.  The state judge and his or her employees have a single entity—CalHR—that is responsible for approving rules governing their employment and providing guidance to the extent there are questions about employees' rights.  The Los Angeles County prosecutor and janitor do not have that resource.  On the record before it, therefore, the Court cannot say that state and local employees are similarly situated in all relevant respects.

10
11
12
13
14
15
16
17
18
19
20
21
22
23

But even if the Court were to analyze § 3205 under the Equal Protection Clause, the Court finds that § 3205 satisfies even heightened scrutiny.  There is no question that California's interest in reducing the existence and appearance of corruption and coercion in the workplace is at least an important one.  *See* Section III.A.ii.  And as discussed, the California Legislature had reasonable concerns about protecting local employees in particular, and recognized the need to ensure that they had uniform rules to ensure these interests were served.  The limitations imposed by § 3205(a) are also closely drawn to limit only a targeted and discrete aspect of local employees' speech rights.  Section 3205 only prohibits local employees from directly soliciting partisan political contributions from their co-workers.  Local employees are still permitted to solicit partisan political donations in broad solicitations.  *See* Cal. Gov. Code § 3205(c).  Section 3205 therefore limits its application to the instances of solicitation that are most troublesome:  those that could impose coercive pressure on colleagues to contribute to campaigns and causes for reasons other than their own personal political beliefs.  The Court finds that even under Plaintiffs' more exacting standard, therefore, § 3205 does not violate the Equal Protection Clause.

24   //
25   //
26   //
27   //
28   //

United States District Court
Northern District of California

**IV.     CONCLUSION**

Accordingly, the Court **GRANTS** Defendant's motion for summary judgment and **DENIES** Plaintiffs' motion.  The Clerk is directed to enter judgment in favor of Defendant and to close the case.

**IT IS SO ORDERED.**

Dated:  3/1/2022

HAYWOOD S. GILLIAM, JR.
United States District Judge